No. 16,881.

CITY AND COUNTY OF DENVER ET AL. *v.*
NORTHERN COLORADO WATER
CONSERVANCY DISTRICT
ET AL.

No. 16,888.

CITY AND COUNTY OF DENVER ET AL. *v.*
UNITED STATES ET AL.
(276 P. [2d] 992)

Decided October 18, 1954.

Petitions for rehearing denied December 13, 1954.
Supplemental petitions for rehearing denied
January 13, 1955.

378

Mr. LEONARD M. CAMPBELL, Mr. GLENN G. SAUNDERS, Mr. JOHN P. AKOLT, Mr. ROBERT A. DICK, Mr. HAROLD D. ROBERTS, Mr. MILTON J. KEEGAN, Mr. JOHN M. DICKSON, for plaintiff in error City and County of Denver.

Mr. F. T. HENRY, Mr. A. W. McHENDRIE, for plaintiff in error City of Colorado Springs.

Mr. WILLIAM W. GAUNT, for plaintiff in error South Platte Water Users Association.

Mr. WILLIAM R. KELLY, Mr. JOHN R. CLAYTON, for defendant in error Northern Colorado Water Conservancy District.

Mr. FRANK DELANEY, for defendants in error Clayton Hill and Colorado River Water Conservation Board.

Mr. JOHN B. BARNARD, Mr. JOHN B. BARNARD, JR., Mr. DUANE L. BARNARD, for defendant in error F. E. Yust.

Mr. GUY V. STERNBERG, for defendant in error Grand Valley Irrigation Company.

Mr. SILMON SMITH, Mr. CHARLES HOLMES, for defendants in error Grand Valley Water Users Association, Orchard Mesa Irrigation District, and Palisade Irrigation District.

*En Banc.*

MR. CHIEF JUSTICE STONE delivered the opinion of the Court.

UNDER our Colorado statutes for adjudication of water rights, two proceedings were brought in Water District No. 36: One for adjudication of rights for irrigation, and the other for adjudication of rights for purposes other than irrigation. These proceedings were consolidated for trial in the court below and are considered together here.

The water rights involved are from the Blue River, a stream located on the Western Slope of the Continental Divide in Colorado, and a tributary of Colorado River. We have here for review the decree of the trial court as to priorities awarded to the water project of the City of Denver and that of the City of Colorado Springs and the refusal of priority to the project of South Platte Water Users Association, all situate on the Eastern Slope of the Continental Divide and all proposing to divert water by

means of tunnels through the Divide, and also the refusal of priority to the Green Mountain Reservoir and hydro-electric plant, which had been sought at first by the United States of America and later by the Colorado River Water Conservation District.

In considering these conflicting claims, the Court must be concerned not with the oratorical hyperboles of counsel, or the alarming prophecies of partisans in the Press, or our own opinions as to comparative value of use, but only with the facts in the record, the questions argued before the Court and the application of established rules of law to the adjudication of the respective property rights in the waters of said stream.

First, considering the provisions of the decree adjudicating the rights of the Denver Blue River project:

By its statement of claim in the proceedings before us, Denver asserted right of priority to its Blue River project, both for direct use and for storage of various amounts in its several reservoirs. To the Dillon Reservoir, only, was awarded a conditional decree, which was for the full amount sought, but of later date. No challenge is made or argument presented before us concerning the decree to the Dillon Reservoir or concerning the failure of the trial court to award decrees to the other reservoirs; the only issues presented in behalf of Denver concern the award to its Blue River diversion project for direct use. Claim was made therefor in the amount of 1600 second feet as of date of March 21, 1914, and conditional decree was awarded therefor in the amount of 788 second feet as of June 24, 1946.

A brief summary from the record of the steps taken by Denver in connection with the intended appropriation of water from the Blue River is necessary to understand the issue presented. Denver is located on the Eastern Slope of the Continental Divide. As early as 1914 there began to be envisioned future shortage of water supply and the need for supplemental water from the tributaries of the Colorado River on the Western Slope

of the Divide. A preliminary reconnaissance of the Blue River basin was made in that year, but nothing further appears to have been done until 1921 when a consulting water engineer was employed to investigate possible diversion of water from the Western Slope. On July 4, 1921, he began field work in the Fraser River basin and during the same summer did work in the Williams Fork basin. As a result of his work in these basins, the Williams Fork and Fraser River water diversion projects were planned and have since been largely consummated, and water rights have been decreed by virtue of diversion therethrough.

Sometime in the summer of 1922, preliminary surveys were made for the purpose of filing on the Blue River and its tributaries. Thereafter the office work was done and filing made in the office of the state engineer on May 31, 1923. The plat then filed showed a proposed transmountain tunnel to bring waters from the south fork of the Swan River, a tributary of the Blue, through the Continental Divide to Jefferson Creek, a tributary of the South Platte River, on the Eastern Slope. It was introduced in evidence by Denver as its Exhibit A.

In 1926 it was determined to investigate locating an intake at a much lower elevation which would involve less difficulty and expense for collection ditches and collect water from a larger drainage area. Accordingly, a survey was made in that year and plat filed with the state engineer in 1927 for a proposed diversion directly from the Blue River by means of a transmountain tunnel extending from Dillon on the Blue River to Grant on the north fork of the South Platte River. By that plan, in addition to the waters of the Blue and its tributaries which could be captured under the earlier plan, there could be diverted also the water from Ten Mile Creek by virtue of a short collection ditch, and the water of Snake Creek by virtue of a short feeder tunnel, both leading into the main transmountain tunnel. This second plat was introduced by Denver as its Exhibit B.

Geologizing of the tunnel site and geophysical work through subsequent years disclosed obstacles to the construction of this second tunnel, as originally proposed, with the result that the geologist in charge reported unfavorably thereon. Accordingly, it was proposed again to change the plan and to construct an angled instead of a straight-line tunnel a half mile longer. This is referred to as the Montezuma tunnel. This new site was geologized in the years 1943 to 1945. However, no plat appears to have been filed in the office of the state engineer or submitted in evidence showing the date of survey or the proposed location of the tunnel as so planned. In 1941 it was proposed to construct a large channel reservoir at the upper portal of the tunnel, located at the confluence of the Blue, the Ten Mile and the Snake. Adoption of this new plan would eliminate the need for any collection tunnels or ditches; provide storage during flood stage, and stabilize the supply. It necessitated a change in the proposed location of the tunnel of approximately twenty feet in elevation and of about three thousand five hundred feet in the point of intake. The large reservoir so proposed was designated as the Dillon Reservoir and a plat showing the plan for it was filed in the office of the state engineer on November 14, 1942. This plat stated that work was commenced on features peculiar to storage therein on October 1, 1941. It was introduced as Denver's Exhibit D.

Still later, sometime between November 16, 1942, the time of filing Denver's claim in these proceedings, and July 1946, Denver's plan for the proposed tunnel was changed still again and it was decided to reduce its size and capacity from 1600 second feet to 788 second feet. In the latter year construction of a tunnel of 788 second feet capacity was actually begun and is still being prosecuted, and the trial court awarded to it a conditional decree in the amount of its capacity.

■ ■ The Colorado River Water Conservation District and others protested the awarding of any decree

whatever to Denver's Blue River project and here assign error to the decree awarded it on the ground that Denver now has an adequate water supply, and that a conditional decree should not be given for a larger quantity of water than it can reasonably expect to put to beneficial use. The uncontradicted evidence in the record discloses that Denver had adequate water supply at the time of the hearing without the Blue River water here sought. As to its further growth and consequent future need, there were divergent estimates, all necessarily without actual knowledge. We cannot hold that a city more than others is entitled to decree for water beyond its own needs. However, an appropriator has a reasonable time in which to effect his originally intended use as well as to complete his originally intended means of diversion, and when appropriations are sought by a growing city, regard should be given to its reasonably anticipated requirements. *Van Tassel Real Estate & Livestock* Co. *v. City of Cheyenne,* 49 Wyo. 333, 54 P. (2d) 906; *Denver v. Sheriff,* 105 Colo. 193, 96 P. (2d) 836. Particularly is this true in considering claims for conditional decrees. As was said in *Taussig v. Moffat Tunnel Co.,* 106 Colo. 384, 106 P. (2d) 363: "So long as no water has been applied to beneficial use, we are concerned only with an inchoate and an unperfected right. When the water is beneficially applied to a designated use, it becomes a property right and the decree then must take on the elements of definiteness and certainty. Such a situation is not now before us. Some of the problems raised may properly be determined when the question of entering final decree is before the trial court or when they are specifically presented here for consideration." While the witnesses as to Denver's future water requirements were not in agreement, there was substantial evidence to support a finding of future need for water from the Blue River within a reasonable time. This is amply confirmed by the City's rapid subsequent growth.

Denver, on the contrary, seeks modification of the decree herein as to its project, both by increasing the amount and awarding earlier priorities. Its argument is based on four asserted grounds, to wit: "I. Denver Appropriated Water from the Blue River in 1921, Enlarged its Appropriation in 1927, Each Time in Amounts Reasonably Required to Meet its Needs. II. Denver has Exercised Due Diligence in the Development of the Blue River Unit of its Water System. III. Denver Could Lawfully Modify the Design of its Diversion System Without Loss of Priority. IV. A Decretal Order Should be Entered Relating to the Claim of the United States and Northern Colorado Water Conservancy District." The last ground is the same as that asserted by the Colorado Water Conservation District and will be considered in that connection. The other grounds, in substance, assert claim to date back the priority of Denver's project in part to 1921 and in part to 1927 upon the ground that there has been due diligence in the development of the Blue River project since those dates and no such change of plan as to prevent such dating back.

While not separately nor specifically asserted in its points argued, Denver contends that the court should have awarded to its Blue River project a total conditional decree for 1600 second feet, although its water is to be diverted and carried through a tunnel which is to have a final carrying capacity of only 788 second feet, the amount which was decreed to it by the trial court. Admittedly, there is no present intent or plan for a tunnel of capacity to divert more than 788 second feet from the stream, but it is asserted that the amount not diverted is to be stored temporarily in the channel reservoir or forebay at the tunnel entrance until the stream flow decreases so that the water there retained can be carried through. As stated in the Denver brief, "So in the final plan for Denver's Blue River unit the smaller bore tunnel operating at full capacity during about five months serves the same function as the bigger bore tun-

nel which would of necessity be working far below capacity at all times, except during the crest weeks of the early summer run-off. The forebay accomplishes no true storage, it merely feeds the direct flow water through the mountain at a uniform operating rate."

Counsel fail to mention that the "forebay" which is planned to hold the water from the early summer runoff in order to maintain the uniform flow during the later season, is in fact the proposed Dillon reservoir to be constructed in the channel of the Blue River at the head-gate of the proposed tunnel, and that Denver sought and was awarded a storage decree to it in the amount of its full capacity. In other words, the "forebay" which "accomplishes no true storage" but is to hold the direct flow water until it can be taken through the tunnel, is at the same time to be the "reservoir" which is to hold water in "true storage" to its full capacity. One cannot add water to a full cup, and may not have a second decree for water from the same source to be held at the same time in the same reservoir to which a decree already has been awarded to its full capacity.

▬▬ Further, the rule is elementary that the first essential of an appropriation is the actual diversion of the water with intent to apply to a beneficial use. "It has been repeatedly decided in this jurisdiction that an appropriation consists of an actual diversion of water from a natural stream, followed within a reasonable time thereafter by an application thereof to some beneficial use." *Windsor Reservoir and Canal Co. v. Lake Supply Ditch Co.*, 44 Colo. 214, 98 Pac. 729. "Claimants to gain a right to the use of a definite amount of water must show that the quantity of water awarded them has been actually diverted, * * *." *Pabst v. Finmand*, 190 Cal. 124, 211 Pac. 11. Water can be actually diverted only by taking it from the stream. The amount so diverted is necessarily limited to the capacity of the ditch or tunnel through which diversion is made. Where a tunnel is planned to have a capacity of only 788 second feet, only

that amount can be diverted through it and any decree in excess of that amount would necessarily be a decree for water which had not been diverted and could not be diverted. Even if such a forebay may be considered as part of a system for direct use and is not given a decree for storage so that retention of water therein might be considered as diversion for direct use, the headgate and point of diversion for direct use would necessarily be at such forebay. Here, the decree for direct use provides for diversion at the three points higher up on the streams, as shown by Denver's map and statement, directly into the tunnel without mention of any forebay in connection therewith, and Denver asserts no error therein.

Denver's contention that decreased flow in a stream through the later season justifies a decree therefrom of a water right in excess of the capacity of its ditch is based on the ground that temporarily holding water in a channel reservoir through the early part of the season for use in the later season is not true storage. That contention is not sound. Virtually all streams in Colorado have such decreasing flow through the season, and most reservoirs are constructed for the purpose of holding the excess early flow for use during the later season. "It is difficult to understand how the words 'temporarily impound,' as applied to the storage of water in a reservoir to be used later for agricultural purposes, add anything to the nomenclature of the law of water. 'Temporary' means lasting for a time only; it is opposed to permanent, but all water impounded in any storage reservoir is to be put there only temporarily; otherwise its capture from the stream must of necessity defeat the purpose of the law of beneficial user." *Handy Ditch Co. v. Greeley & Loveland Irrigation Co.,* 86 Colo. 197, 280 Pac. 481.

The statute recognizes two classes of appropriations for irrigation, one for ditches diverting water to be used directly from the stream, and one for the storage

of water, to be used subsequently. *Holbrook District v. Fort Lyon Co.*, 84 Colo. 174, 269 Pac. 574. To the amount that water when available is to be diverted directly to its use, a direct use decree must be sought. To the amount that it is to be held in a reservoir for later use, a storage decree must be sought. Where water is stored in a channel reservoir, a ditch headed in such reservoir has no right by virtue of direct use decree to deplete such storage, but may properly take water from the reservoir by virtue of such decree only in the amount of the current inflow from sources subject to such direct use decree to the ditch.

There was no error in awarding to Denver's Blue River project for direct use a volume limited by the total proposed capacity of its diversion tunnel. The question of right of a city, after diversion, to store water diverted for domestic use is not here argued.

More serious questions are raised by Denver's challenge to the priority date awarded the Blue River project in the decree. The basic law is not disputed, to wit: (1) that priority of appropriation shall give the better right as between those using the water for the same purpose; (2) that as to the rights here involved a municipal corporation has no different status from that of an individual or any other party to the proceeding; (3) that although an appropriation is not complete until actual diversion and use, still, the right may relate back to the time when the first open step was taken giving notice of intent to secure it *(Sieber, et al. v. Frink et al.,* 7 Colo. 148, 2 Pac. 901; *Baca Co. v. Model Co.,* 80 Colo. 398, 252 Pac. 358); (4) that right to relate back is conditional that construction thereafter was prosecuted with reasonable diligence, and conditional further that there was then "a fixed and definite purpose to take it up and carry it through" *(Fruitland Irrigation Co. v. Kruemling,* 62 Colo. 160, 162 Pac. 161; *Wyoming v. Colorado,* 259 U. S. 419); and (5), that the questions of reasonable diligence and of fixed and definite purpose are questions

of fact to be determined by the trial court from the evidence.

While Denver as yet has completed no appropriation of any water whatever from the Blue, it here seeks to have awarded to its Blue River project a conditional decree establishing by relation back the dates of filing its plats A and B as the dates of priority to which it contends it will ultimately be entitled. Determination of such date of priority must depend first upon the date when the first step was taken in connection with "the existence of a fixed and definite purpose," to carry it through, and second, upon its prosecution with reasonable diligence.

In each of the plats filed by Denver as its Exhibits A, B and D, it is recited that work was commenced by survey on the 21st day of March, 1914. In its statement of claim, Denver asserts the same commencement date. However, from the evidence submitted, it appears without dispute that the 1914 date was based entirely on reconnaissance surveys made in that year by the Public Utilities Commission not followed by any construction, and in its briefs Denver now abandons that date and claims right to conditional decree to the Blue River project for 1200 second feet as of July 4, 1921, and 400 cubic feet as of October 19, 1927, the former being the date when it is contended that survey was begun on a project planned to divert 1200 second feet, but some two years before filing any plat thereof, and the latter date being the date of the filing of its plat Exhibit B, showing plan to divert 1600 second feet.

There is no evidence that any work, even of survey, on the Blue River project was begun on July 4, 1921, or at any time prior to the summer of 1922. The claim for the 1921 date is based solely on the fact that survey was started on that date on Denver's Williams Fork and Fraser River projects and the contention that those two projects and the Blue River project constitute in fact a single irrigation project, and consequently that in the

determination of the date when the first step was taken, and also in the determination of reasonable diligence since such date, the three projects should be considered as a single project.

In determining the date "when the first step was taken," a survey made on the Fraser River or on the Williams Fork would of itself be no evidence of intent to appropriate water from the Blue River. Certainly such a survey in a far distant basin supplying water to another stream would constitute no notice to another appropriator of such intent. The filing of a plat of method of diversion from the Fraser or Williams Fork would be no evidence of intent to appropriate water from the Blue or notice of such intent. Therefore, there is nothing to support the contention that the priority should be dated as of July 4, 1921. At most, the priority for the Blue River project could date back only to the time when the first step was taken in construction of a project on the Blue River.

In determining reasonable diligence, also, we find no ground for holding, as urged by Denver, that the Blue River project, the Williams Fork project and Fraser River project are each units of a single project so that the construction work on those projects and the expenses incurred thereon can be considered as part of the construction of the Blue River project. Denver's claim for its Blue River project was made by survey, plat and filing entirely separate from those of its Fraser and Williams Fork projects. It seeks priority to water from an entirely separate stream, not even confluent with the Fraser River or Williams Fork except to the extent that each is ultimately a tributary of the Colorado River. It seeks water to be diverted from an entirely separate drainage basin. It was surveyed and planned after those projects. It directly affects other claimants who are protestants here but not directly affected by those projects. It is to be carried through an entirely separate conduit — the Fraser River being diverted through the

Moffat Tunnel and the Williams Fork through the Jones Pass Tunnel, and the Blue, as now planned, to be carried in the Montezuma tunnel to be bored through the Continental Divide many miles to the south of the others. Its water rights are here sought to be adjudicated as entirely separate from the rights of those projects. It has even less relation to the Fraser River and Williams Fork projects than to Denver's South Platte water system with which it will share the same river channel and reservoirs. In fact, the only relation between the Blue River project and these other projects is that their several waters may ultimately rest in common filtration and concentration plants, and that by means of exchange they may be used cooperatively for supplying prior rights or filling storage reservoirs such as would be probable in the case of any other independent water right. The priority of appropriation which gives the better right under our constitution is priority on a stream rather than on a project, and any diligence in construction to permit dating back of priority on the Blue River must be diligence relating to and promoting the Blue River appropriation. No such relation here appears. Therefore, diligence in the prosecution of the Fraser and Williams Fork projects cannot be imputed to the Blue River project. However, the fact that the City of Denver was engaged in the construction of these or other enterprises may properly be considered together with all other evidence as to existing facilities and ability of the city in determination of the issue of reasonable diligence.

Considering the Blue River project by itself: Denver's first plan of 1922 contemplated the appropriation of water from the south fork of Swan River, a tributary of the Blue River, by means of a tunnel which would take the water to Jefferson Creek, a tributary of Tarryal Creek, which in turn is a tributary of the South Platte River. That plan required seventy-six miles of collection flumes and tunnels along steep slopes and over difficult terrain to bring the water to the headgate

of the main transmountain tunnel. There is no evidence of any actual construction work whatever on that proposed project. The upper portal of its proposed tunnel was many miles from the portal of that under subsequent plans. Its altitude was 10,322 feet as against an altitude of approximately 8,800 feet under subsequent plans. The length of its tunnel was approximately four and a half miles compared with that of approximately twenty-four miles under subsequent plans. It could collect water from less than half of the area available to supply the presently proposed tunnel. The 1923 plat of that project showed claim to appropriate 1200 second feet, while the 1927 plat shows claim for 1600 second feet, not by virtue of enlargement of the former claim, but as "a relocation of the project." No appropriation was ever awarded to it or claim filed for adjudication in its behalf, and any thought of its construction was abandoned upon the final adoption of a later plan. Plainly, at the time of the survey and of the filing of the plat of said first plan in 1923, there was no fixed and definite purpose to take it up and carry it through; there was no diligence in its construction, but an entire abandonment. The priority of a water right may not be dated back to the date of survey or filing of plat of a diversion proposal which has been abandoned in favor of another and very different plan. *Holbrook Irrigation District v. Ft. Lyon Co.*, 84 Colo. 174, 269 Pac. 574; *Colorado Land & Water Co. v. Rocky Ford Co.*, 3 Colo. App. 545, 34 Pac. 580; *Wyoming v. Colorado*, 259 U.S. 419. Therefore no part of Denver's claim can be tied or dated back to its 1923 plat.

The next step in the attempted solution of the Blue River problem was taken sometime in 1926, when Engineer Bull was sent by Denver to study a more simple method of collecting and carrying its waters than appeared from the plan presented in Exhibit A. An extended survey in that year followed by office work resulted in preparation of Denver's Exhibit B, which was filed in the office of the state engineer on October 19,

1927. Denver contends that the priority of its Blue River project should be dated back at least to the date of such filing. The trial court denied that contention.

Two issues presented themselves to the trial court therein. (1) Was there in 1927 a fixed and definite purpose to take the plan shown by Exhibit B and carry it through to completion? (2) If so, was that plan prosecuted with due diligence? In order to support Denver's claim to the 1927 date, it was necessary to find both in the affirmative.

 As to the first issue of fixed and definite purpose: Our Colorado Constitution, section 6, article 16, provides that "priority of appropriation shall give the better right." Appropriation requires actual diversion and use. The doctrine of relation back is a legal fiction in derogation of the Constitution for the benefit of claimants under larger and more difficult projects and should be strictly construed. *Fruitland Irrigation Co. v. Kruemling,* 62 Colo. 160, 162 Pac. 161. It is not sufficient that there was an intent to divert from the Blue. In order to date back such intent must have been to divert a definite volume as evidenced by the capacity of the ditch and at a definite point evidenced by location of the headgate so that other appropriators could know the nature and extent of the claim.

If we assume that a filing under our map statute (Sections 27-32, chapter 90, '35 C.S.A.) constitutes notice to other appropriators as well as evidence in court, and that the provisions as to the time of filing are surplusage, still such maps are, as declared therein, only prima facie evidence of intent to make such construction and to utilize such rights as are shown in the map and statement. Was there any evidence in the record to overcome the prima facie evidence of the map? We think there was, both as to volume and as to fixed plan of diversion.

A. As to volume:

Denver's map and statement of 1927 showed a tunnel of 1600 second feet capacity and thereby if timely prima

facie its intent to divert that maximum volume of water. But the testimony showed without contradiction that the tunnel as later planned and as now being constructed has capacity of only 788 second feet. Moreover, there was in evidence an agreement executed as of the 18th day of March, 1943, between Denver and the South Platte Water Users Association wherein Denver agreed in part as follows:

"1. The facilities which are the subject matter of this contract comprise all the right or rights of both parties hereto to use physical structures acquired or constructed on or after September 27, 1942, for the diversion or storage of waters of the Blue River, and the legal title to which structures stands or will stand in the name of either of the parties to this agreement, and also the right or rights (without regard to date of initiation) of the parties to divert or use such Blue River water, which rights of diversion shall be in proportion to the respective ownerships of the parties as defined in paragraph 2 hereof.

"2. Ownership of the facilities shall be proportional to the financial contributions of the parties to this agreement to the construction or creation of the facilities made on or after September 27, 1942, * * *.

"4. * * * In event either party shall prosecute such development, the other party shall have the right, if exercised within five years of the expenditure, to contribute not to exceed fifty per cent of any amount expended by the other party on account of the construction, or acquisition, of any unit of the facilities, or the facilities as a whole, at the choice of the electing party * * *."

Such agreement would be convincing evidence that Denver had no fixed intent to appropriate for its users even the full capacity of the 788 second-foot tunnel, but only half that capacity, and that any or all of the remaining capacity of the tunnel might be owned by other parties for use in the irrigation of farms far from Denver

and far outside the original and declared intent of the appropriator.

B. As to the plan and point of diversion:

The trial court had before it in evidence the application of the City and County of Denver under date of December 6, 1935, wherein Denver petitioned the Federal Emergency Administration of Public Works for an allotment of $100,000.00. That application recited, inter alia, the need of the South Platte basin for additional water, the existence of the Blue River immediately west of the Continental Divide, so that a tunnel could be constructed to bring water therefrom, the two surveys already made of alternative means of diversion and the possibility of constructing such transmountain tunnel at a number of other locations and other elevations. It further recited the possibility that a thorough study would show the necessity for, or at least the advisability of, a compensating reservoir on the Western Slope, and particularly called attention to the Green Mountain Reservoir site. It further recited the many studies and available data "concerning the possibility of diverting. Blue River water into the South Platte watershed"; requested further study of such proposed diversion and "that these studies and investigations include survey for both the upper site and lower site for the transmountain tunnel and also the consideration of four or five additional routes for the tunnel." Therein Denver asked that the proposed survey should include "(e) a comparison of the different possible routes for the transmountain tunnel, including a study of variations in possible method, such as pumping the water to a higher elevation so as to obtain the advantage of a shorter tunnel; (f) the relative costs of various routes of the transmountain tunnel and the various methods of constructing the same."

There was before the court also much evidence that in 1938, 1939 and 1941, there had been study by the Board of Water Commissioners of Denver and the United States Bureau of Reclamation as to the value, expense, and

method of Blue River diversion; that numerous conferences were held with Bureau representatives and discussion had of different plans and methods of diversion, and additional surveys were made therefor; that the Bureau of Reclamation appropriated funds for such surveys and, on December 31, 1941, Denver agreed to share in the expense of surveys and appropriated $100,000.00 therefor; that an engineering board of review was set up in 1941, consisting of members from the Board of Water Commissioners of Denver, the South Platte Water Users Association, the Bureau of Reclamation and Colorado Water Conservation Board, to check the various possible tunnel sites and determine which route was best; that said board investigated at least three different methods and routes by which Blue River water might be diverted and carried to the South Platte, one of which was much the same as the route proposed by Denver's Exhibit B, and that under date of February 16, 1946, that board made its report to the President, Board of Water Commissioners, City and County of Denver, and others interested, finding that there were definite engineering, construction, operation and administration advantages in the Montezuma route, and recommending that a detailed project report of that route be prepared.

The plan shown by Denver's Exhibit B provided for three points of diversion: one on the Blue at the intake of the tunnel; one on Ten Mile Creek, with a ditch to carry the water therefrom to the Blue, thence to the intake, and one on Snake River, from which a branch tunnel would take the water to the main tunnel. Thereafter, the plan was changed from a straight to a dog-leg tunnel. At some later time the plan was again changed to provide for the building of a large reservoir at Dillon near the confluence of the Blue with the Ten Mile and the Snake, and with a new single point of diversion in the reservoir which captured waters more than a mile below the former proposed points of diversion. Apparently about the same time, the plan was changed again

to reduce the size of the tunnel from a capacity of 1600 second feet to a capacity of 788 second feet, and the small portion of the tunnel now constructed is of that smaller capacity. During the entire period from 1927 to 1946, substantially all the work done and all the money spent by Denver in connection with its Blue River project was for investigation and exploratory work or work in connection with Eastern Slope reservoirs which were not dependent on any one plan for diversion or even on Blue River water. This and similar evidence before the trial court presented substantial support to the contention of protestants that Denver had no fixed and definite plan and no definite point of diversion prior to the report and recommendation of said board in 1946, and supported the decree of the trial court consistent therewith.

As to the second question, that of diligence:

In summary, the evidence showed that the Exhibit A plan of 1923 has been abandoned without any construction whatever; that following the filing of the Exhibit B plan in 1927, no evidence of actual excavation work in connection with its proposed tunnel appeared until 1942, some fifteen years later, when a cut was made and a small exploratory tunnel was driven about 400 feet at a place then intended to be the west portal to ascertain the condition of the ground. The proposed location of the portal has since been changed and a part of the excavation has caved in. No other work was performed on the ground until July 1946 when work at the east portal of the tunnel was started. Denver's Chief Engineer testified that "That was the first actual construction work." It had been driven 2850 feet out of a total distance of approximately twenty-four miles in the period from 1946 to the date of hearing. In addition to the tunnel, Denver's plan of diversion as last approved at the time of the trial included the large Dillon Reservoir on the Blue River at the intake, plat of which was filed in 1942, but no construction begun before 1946.

As satisfying the requirement of reasonable diligence,

Denver showed that after the filing of the plat in 1927, the tunnel line was staked in 1931-2, and triangulation survey monuments installed for geological studies. These surveys brought about an unfavorable report on the straight tunnel as platted and a recommendation that a dog-leg tunnel be constructed by way of Montezuma. But the new line was not staked and geologized until sometime in 1943, 1944 and 1945. Over a period from 1928 to 1948, Denver's witnesses testified that survey was made and rights of way acquired for the Two Forks Reservoir, but that reservoir is to be located on the South Platte River and, as shown in the application for right of way, was planned for regulation of that river, storage of its flood waters and power development. It has no essential connection with direct use diversion from the Blue River; even its construction would not indicate any plan for Blue River diversion or give another appropriator any notice of such plan. Between 1928 and 1932 surveys were made for power lines to carry the electrical energy proposed to be generated by the project. In 1932, right of way was granted for the twenty-three mile tunnel, but for a period of ten years no step was taken toward its construction. It appears that throughout the period from 1936 to 1941 efforts were made by the City to induce the United States Bureau of Reclamation to build the project, but without success. There was no evidence of any effort by Denver to finance the project itself prior to the year 1946, but only of efforts to induce the United States to do so.

To support its contention that this work was sufficient to satisfy the requirements of reasonable diligence, Denver cites *Taussig v. Moffat Tunnel W. & D. Co.,* 106 Colo. 384, 106 P. (2d) 363, wherein it was held that surveys, preparation of maps, acquiring of rights of way and options and obtaining a contract for the carriage of water through the Moffat Tunnel, drilling of test holes, clearing of timber along proposed ditch lines and other similar work was sufficient to satisfy the requirement of reason-

able diligence in construction of a ditch leading to the Moffat Tunnel. However, there the party seeking diversion of the water was a private company of apparently limited resources. The dating back was apparently for a period of less than five years, and the decision of this Court affirmed the finding of the trial court, holding that there was due diligence; while here, we are asked to hold that such expenditures on the part of a great city, without shown limitation upon its financial capacity, spread out over a period of nearly twenty years would require us to reverse the decision of the trial court and say that such expenditures were evidence of reasonable diligence as a matter of law.

Kinney, in his great work on irrigation, says: "Probably the best definition of the word diligence was given by Lewis, C. J., in rendering the opinion in an early Nevada case. It is there defined as 'the steady application to business of any kind, constant effort to accomplish any undertaking.' 'It is the doing of an act or series of acts with all possible expedition, with no delay except such as may be incident to the work itself.'" Kinney on Irrigation and Water Rights, Vol. 2, §735.

Our statute authorizing conditional decrees requires that each claimant shall offer proof in support of his claim and "if it shall appear that any claimant * * * has prosecuted his claims of appropriation and the financing and construction of his enterprise with reasonable diligence" the court shall enter decree determining the priority of right.

It is undisputed that during a period of about twenty years, Denver had not even begun the actual construction of its project and had made no effort whatever as appears from the record, towards financing it, but only a laudible but fruitless attempt, after nine years of inaction, to induce the United States Reclamation Service to finance it for the joint use of Denver and the South Platte Water Users Association. Meanwhile others have worked diligently and long to put a part of this water

to actual use. The record before us does not show such conclusive evidence of "steady application" to the business of constructing the project or of such "constant effort to accomplish" it as to require us to hold that the trial court erred in refusal to date back Denver's appropriation, to the loss of such prior users. On the contrary, in order to sustain Denver's claim, we should have to establish as a law of Colorado that a great city or a great corporation, by the filing of a plat of a water diversion plan and the fitful continuance of surveys and exploratory operations, could paralyze all development in a river basin for a period of nineteen years without excavating a single shovel full of dirt in actual construction and without taking any step towards bond issue or other financing plan of its own for carrying out its purpose; that for nineteen years no farmer could build a ditch to develop his farm and no other city or industry could construct a project for use of water in that area without facing loss of their water when and if the city or corporation which filed the plat should actually construct its project. This we cannot do.

Second, considering the claim of the South Platte Water Users Association:

Said claimant is a mutual irrigation company comprised of water users from the South Platte River and its tributaries over a large area.

In its statement of claim, the Association sought decree for 3300 second feet to its transmountain diversion project by virtue of original construction of date of October 27, 1942, and for storage priorities of same date totaling 246,481 acre feet by virtue of original construction for storage to the Cheesman Reservoir, Eleven-Mile Canyon Reservoir and Antero Reservoir, all of which reservoirs are located on the Eastern Slope of the Divide. Claimant makes no showing of any construction work whatever in connection with said claimed water rights or even of original survey. While a plat was filed by it on November 14, 1942, showing the general course of its proposed

collection ditch and collection tunnel and its so-called "Webster Tunnel" by which the water was to be diverted from Dillon on the west slope to Grant on the eastern slope, it appears without dispute from the testimony that the plat was made by an engineer employed by the City of Denver and was based upon surveys previously made by him and other engineers in the basin of the Blue and Williams Fork Rivers. It appears further that while the proposed collection facilities would collect water from other sources than that sought to be included by Denver in its Blue River project, claimant's collection facilities are planned to conduct the water only to Dillon, and the so-called Webster Tunnel, by which they are proposed to be diverted thence through the Continental Divide, is in fact the Montezuma tunnel which Denver proposes to construct and is now constructing. Claimant association claims no intent to enlarge said tunnel but merely for "joint use" thereof with the City of Denver. Since that tunnel is proposed to have a capacity of only 788 second feet, and Denver has already sought conditional decree for 1600 second feet thereto, this claim of further appropriation of 3300 second feet by the South Platte Water Users Association makes total claim for appropriation through the tunnel of more than six times its total capacity in behalf of Denver and its associate for their joint use. The basis for this claim for joint use of the tunnel is the written agreement between Denver and the Association hereinbefore quoted from, which provides for ownership of facilities and right to use proportional to financial contributions of the parties.

It being elementary that decrees go to the ditch (or tunnel) and not to the owner, it might be that under the existing agreement the Association could claim some share in any decree finally awarded to Denver's Blue River project, or that by the construction of the collection facilities proposed by the Association to bring water from new sources, additional water might be obtained and decreed as an additional source to supply any decree

ultimately awarded to the tunnel. But no claim is here made for additional sources, — only for a second decree to the Montezuma tunnel under another name for more than four times its capacity, when it has already been awarded a conditional decree for its full capacity.

Further, it appears beyond dispute that no work of survey or construction has been done, either on the direct use or storage facilities, and no money appears to have been spent thereon and no effort made for financing by the Association, the sole and only steps taken by or in behalf of claimant having been: (1) The procuring and filing of a plat based upon prior surveys for other employers; and (2) The entering into an agreement with the City of Denver whereby, as the Association urges in its brief, any work done by Denver upon the tunnel or diversion structure "would redound to the benefit of the Association as a part of diligence on the part of the Association toward completing a diversion of water under its claim of right."

On such a record the trial court could not do otherwise than deny any decree to the Association.

Next, considering the provisions of the decree adjudicating the rights of the Colorado Springs project:

By its statement of claim, that city sought conditional decrees to its several ditches diverting water from the Blue River, all as of date of October 1907. Conditional decrees were sought also to its several reservoirs filled therefrom, all as of dates prior to 1948.

Conditional decree was awarded by the trial court to each of said ditches and reservoirs in the amounts prayed for, but all as of date of May 13, 1948, instead of the dates sought. The City having been given decrees for the full amounts prayed for, as of the date when it took over the construction of the project, the sole issue here is whether or not its predecessors in interest and title had made such beginnings of an appropriation and prosecuted the work of construction with such diligence as to entitle

the City to decrees relating back to a date before the City began its work of construction.

While the statements of claim sought relation back to date of October 1907, the City now abandons any contention for that date and seeks relation back to date of September 27, 1927, except for the Mayflower reservoir for which it claims date only as of the date awarded to it. Such relation back to the 1927 date is sought by virtue of the fact that witness James D. Galloway testified that on that date he began a survey of means of getting water from the Blue River to the Eastern Slope and that as a result of said survey filing was made of map and claim in the office of the state engineer on July 16, 1929, which appears as Colorado Springs' Exhibit A. He testified that he worked on this proposal during 1928 and that in 1929 he and a hired man staked the survey and dug seventy-five feet of ditch in the top of Hoosier Pass, on a contemplated portion of the ditch, which was thereafter abandoned in favor of a tunnel plan. In 1930 he made further survey and maps to accompany application to the General Land Office for rights of way. In 1931 he made further surveys and an amended map, made contacts with the General Land Office, and cleared one hundred feet of right of way for the ditch. In 1932 he cleared another hundred feet of right of way and made stream measurements, and in 1933 he cleared still another hundred feet of right of way, and, through those years he made stream measurements and gathered data, until in 1935 he completed his report on the water supply, geology and costs of the project. In 1936 and 1937 he was "mostly contacting different people to get them to put up money for the construction" and at "water studies" and studies as to best tunnel location. From 1933 until 1948 no work whatever was done by him or his associates on the project.

Galloway's first plat, Colorado Springs' Exhibit A, filed in 1929, is entitled "The preliminary map of the Continental-Hoosier Ditch and Pipe Line," showing con-

templated carrying capacity of 200 second feet for which claim was made, "to be used on the lands of the Henrylyn Irrigation District, and taken from the South Platte River at their present headgate, as shown on their previous filing No. 4752." His second plat, Colorado Springs' Exhibit B, also filed in 1929, is entitled, "Map of the Continental-Hoosier Diversion System," and is assertedly "for Agricultural and Domestic purposes on the Eastern Slope of the Continental Divide." Galloway testified that his survey was largely on his own initiative; that he worked trying to find someone to finance the filings and construction of the project; that he first interested the Henrylyn Irrigation District, which he thought put up the filing fee, and that the fee was afterwards repaid to the district when it concluded not to take over the project. The Henrylyn Irrigation District was located near Hudson, Colorado, some thirty miles northeast of Denver. It lay in the South Platte River basin far from Colorado Springs, which is in the Arkansas River basin. Galloway, or others associated with him, thereafter attempted to interest the Twin Lakes Irrigation and Reservoir Company in the Arkansas Valley. Not succeeding there, they attempted to interest the water board of the City and County of Denver, then the Burlington Ditch, located east of Denver on the South Platte, then, in turn, the English High Line Ditch, Stanley Reservoir Company, and the cities of Englewood and Aurora and Lakewood, all on the South Platte. Not until 1947, so far as appears, was the City of Colorado Springs in any way approached or interested in the project. In November of that year, it acquired by purchase the rights, if any, of Galloway and others in the project. The next year Galloway was employed by the City as project engineer, and, on May 13, 1948, prepared the final maps and statements of claim evidencing the plan upon which construction was then begun in behalf of the City and has since been pursued.

Summarizing the labors of Galloway and his asso-

ciates, it appears that in the period of twenty-one years from 1927, when they started survey, to 1948, when they sold to the City of Colorado Springs, the extent of their actual construction was the digging of seventy-five feet of ditch on a part of the line which was ultimately abandoned, and the clearing of three hundred feet of right of way, all prior to the year 1936. In the subsequent period of twelve years, until the sale to and his employment by Colorado Springs, he and his associates apparently did no work whatever and paid no further attention to their scheme of transmountain diversion.

In an attempt to account for this long period of inaction and show evidence of diligence in construction, it is urged that one H. V. George was active during the last six years of that period and had some connection with Galloway and his associates. George filed a plat, largely a duplicate of that of Galloway, in 1942. He testified that this was an independent filing made in the hope that he could again interest the Henrylyn District in construction of a project for use around Hudson and Keenesburg. His filing and plat, Colorado Springs' Exhibit C, was entitled, "East-West Transmountain Diversion," and claim was made for a total to the several ditches of 125 second feet, "for irrigation, domestic and power purposes in the South Platte River Basin in Colorado." He admitted that he had no independent survey and that his plat was based on Galloway's survey in 1929. There appear in the abstract of title offered by Colorado Springs certain unexplained purported conveyances to George, and Galloway statements of claims and filings made subsequent to George's filing, and Galloway testified that George gave an option to purchase the same, which was not fulfilled. In addition to unsegregated surveying expenses in connection with reservoirs, the only substantial expenditures testified to by George consisted of a trip to New York City for the purpose of promoting the financing of a purchase by the Henrylyn District, and the payment of some $5,000 for ditch and

tunnel construction, but he admitted that the tunnel involved was not the tunnel as contemplated by Galloway; the work rather was done on an old mining company tunnel which he had purchased and then intended to continue through the mountain. That intent was subsequently abandoned. He could not tell its location or where it lay with reference to the tunnels appearing on the plats and made no claim that it constituted any part of the system being built by Colorado Springs or was of any service to it.

Under the facts before the court, which we have attempted to outline briefly, it was necessary for it to determine, first, whether there had been reasonable diligence by Galloway and his associates from 1927. As we have already noted, the only actual construction, other than surveying during the period of more than twenty years, was seventy-five feet of abandoned ditch and the clearing of the right of way for three hundred feet of ditch. The evidence shows that the parties interested up until 1937 were continuing their attempts to interest various ditch companies in their project. Counsel of the City of Colorado Springs insist that if an appropriator has given notice of his intention by filing maps and statements or by actual work in beginning construction on the ground sufficient to indicate his intention to appropriate, he is entitled to relate the date of his appropriation back to the first step, provided he proceeds in his efforts with reasonable diligence sufficient to demonstrate that he has not abandoned his intention to complete the appropriation. We cannot agree with that contention. One may procrastinate and be dilatory, entirely without excuse or reason, yet without any intent to abandon the project. The requirement of the statute authorizing conditional decrees is not that the claimant shall not have abandoned, but rather that he has prosecuted his claims of appropriation and the financing and construction of his enterprise with reasonable diligence. It can hardly be contended that the insig-

nificant work of construction on the ground by Galloway and his associates or the vague labors of George in connection with an abandoned tunnel would have required or justified a finding of due diligence.

There is another and convincing reason why Colorado Springs' right cannot be dated back to the date of the beginning of the Galloway work or the George work, and why their efforts to sell their scheme cannot be considered in determining diligence. Appropriation of water requires both diversion and use. In order to complete an appropriation, there must be an actual taking of water for beneficial use. In order to initiate an appropriation, there must be an intent and purpose by the appropriator, actually to take the water and to put it to beneficial use. The statute (section 195, chapter 90, '35 C.S.A.) requires that he shall make it appear to the court and referee that he "has prosecuted his claims of appropriation and the financing and construction of his enterprise with reasonable diligence * * *." Here, neither Galloway nor George had any "claim of appropriation"; neither owned or intended to procure any land for irrigation or any power plant for power use. Neither represented any municipality for domestic use. Neither had an "enterprise" for "financing and construction." Neither attempted to finance or intended to build the system of ditches, reservoirs and tunnel which they platted. They did only token work to give pretense of a right which they might sell. Mr. Galloway testified: "Q. Did you price the project to any of these people, or your interest in it? A. No, we wanted them to construct it." Mr. George testified: "Q. The whole purpose was to develop the project for the purpose of eventually disposing of it to someone else? A. I think that is right, yes, who could utilize the water." They were promotors and speculators — not appropriators. A claim for mere speculative purposes by parties having no expectation themselves of actually constructing works and applying the waters to some useful purpose gives them no rights

against subsequent appropriations made in good faith. *Weaver v. Eureka Lake Water Company*, 15 Cal. 271; *Nevada County & S. C. Co. v. Kidd*, 37 Cal. 282, page 314.

The City relies on *Taussig v. Moffat Tunnel W. & D. Co.*, 106 Colo. 384, 106 P. (2d) 363, to support its claim to date back. Claimant there was a private corporation with corporate authority to construct and the declared intent to construct the ditches and reservoirs surveyed and platted in its behalf. It had procured right of way for its waters through the Moffat Tunnel to the South Platte River from which it proposed to divert them for sale to land owners. It was engaged in negotiations with ditch companies and individuals in the Boulder Creek and South Platte Valley for sale of the water it was to divert and carry to them. The rule there declared must, as always, be limited to the facts to which it is applied. It cannot be construed as supporting a claim that mere speculators, not intending themselves to appropriate and carry water to a beneficial use or representing others so intending, can by survey, plat and token construction compel subsequent bona fide appropriators to pay them tribute by purchasing their claims in order to acquire a right guaranteed them by our Constitution.

Still further reason why Colorado Springs' right cannot be dated back, as it seeks, is that both the Galloway project and the George project were incomplete and abandoned projects. Both Galloway and George filed their plats in the hope of selling the scheme to the Henrylyn District on the South Platte, but in both cases that hope failed and that plan was abandoned. Likewise abandoned were all their subsequent attempts to sell their scheme to others. The fact that Colorado Springs used ditches or other facilities which had previously been surveyed for projects thereafter abandoned prior to the conception of its project would give it no right to date back to the beginning of the abandoned projects. *Holbrook Irrigation District v. Ft. Lyon Com-*

*pany,* 84 Colo. 174, 269 Pac. 574; *Wyoming v. Colorado,* 259 U. S. 419, 42 Sup. Ct. 552.

Next, considering the provisions of the decree denying adjudication of rights to Green Mountain Reservoir:

On January 19, 1944, the United States of America and Northern Colorado Water Conservancy District filed in the water adjudication proceeding below their petition and statement of claim for Green Mountain Reservoir, hydroelectric plants No. 5 and No. 6, and Elliott Creek Canal. In addition to statements as to appropriation, said statement recited the authority and direction of the Attorney General therefor; further recited that the United States of America, in pursuance of the provisions of the Reclamation Act and pursuant to Senate Document No. 80, Seventy-fifth Congress, first session, was in process of constructing the Colorado-Big Thompson reclamation and power project and had appropriated water from the Blue River and its tributary Elliott Creek for irrigation and other uses, and that Green Mountain Reservoir and said hydroelectric plants and Elliott Creek Canal are parts of said project and almost completed; further recited that Northern Colorado Water Conservancy District was organized by virtue of the laws of the State of Colorado for the purpose of contracting with the United States of America for the construction of said project, of which Green Mountain Reservoir is a part, and had entered into contract with the United States of America, whereunder it had agreed to pay part of the cost of construction thereof.

Thereafter the United States, by its counsel, petitioned for and obtained consolidation of the two proceedings for adjudication, and further petitioned for and obtained a continuance of hearing. Then, on July 11, 1949, the day set for the hearing of witnesses, the United States filed with the court a notice, entitled in the proceeding, that it thereby withdrew from said case the claims of the United States of America, theretofore filed on behalf of itself, its Bureau of Reclamation and For-

estry Service, Department of Agriculture, and that the attorney for the Northern Colorado Water Conservancy District joined in said withdrawal.

The Colorado River Water Conservation District then promptly filed its statement of claim for adjudication of right to the Green Mountain Reservoir, reciting that claimant district was a beneficiary under Senate Document 80, Seventy-fifth Congress, and that the Green Mountain Reservoir and power plant was constructed for the benefit of said claimant and other claimants and users from the Colorado River and its tributaries in Western Colorado, and the claim was made for the use and benefit of all such persons.

At the hearing, the district introduced evidence in support of its claim, which has not been disputed. It included showing of the construction of the reservoir and the need for and the actual use of water therefrom by landowners within the district, and that the Act of August 9, 1937, 50 Stat. 595, authorizing the construction of the Green Mountain Reservoir, provided that the project should be constructed in accordance with the plan described in Senate Document No. 80, Seventy-fifth Congress; that said Document, which was introduced in evidence, required that said reservoir be constructed with a capacity of 152,000 acre-feet of water, of which 52,000 "shall be available as replacement in western Colorado, of the water which would be usable there if not withheld or diverted by said project," and 100,000 acre-feet be stored primarily for power purposes and released and "be available, without charge, to supply existing irrigation and domestic appropriations of water, including the Grand Valley reclamation project, to supply all losses chargeable in the delivery of said 52,000 acre-feet of water, and for further use for domestic purposes and in the irrigation of lands thereafter to be brought under cultivation in western Colorado." It appears also from said Document No. 80 that the right to the use of said water from the reservoir shall be free from any obligation of payment

by the Western Slope users and as a replacement for the waters taken from the river for use through the tunnel on the Eastern Slope of the Continental Divide.

Thereafter, promptly upon its appearing from the form of decree tentatively submitted by the court for consideration of claimants that said claim of Colorado River Water Conservation District was to be denied, Grand Valley Water Users Association, Orchard Mesa Irrigation District and Palisade Irrigation District filed their joint petition seeking order of the court to reopen the proceeding and permit them to file their own statement of claim or adopt that of the Colorado River Water Conservation District, and to adopt the evidence introduced as to the said Green Mountain Reservoir and introduce further evidence concerning the same, reciting, inter alia, that said Grand Valley Water Users Association was organized by water users under the Grand Valley Reclamation project, constructed by the United States pursuant to the Reclamation Act, with authority to acquire water for irrigation of the lands of its shareholders and to construct and acquire irrigation works to generate and sell power and to engage in the operation of the Grand Valley Reclamation project, and was obligated by contract with the United States to distribute water to the consumers under said project by its canal, to which had been awarded certain priorities of right; that the Orchard Mesa Irrigation District and Palisade Irrigation District, organized pursuant to Colorado law, contained large acreages of irrigated land and owned canals with decreed water rights from the Colorado River for use on the lands in said districts; that during the years 1945 to 1948 and the year 1950, there was not sufficient water in the Colorado River to supply the needs and priority rights of petitioners; that to make up the deficiency, there were released from the waters stored in Green Mountain Reservoir, in Water District No. 36, large amounts of water as particularly set out in said petition, all of which had been beneficially used for

the generation of power and the irrigation of lands belonging to water users under said association and in said districts; that petitioners were not personally served with notice of the proceedings and, so far as they were informed, believed that the Colorado River Water Conservation District was appearing in their behalf and was authorized to take all necessary steps to obtain a decree adjudicating the rights of the petitioners; that petitioners had recently been advised that the claim of said conservation district had been denied by this court in its entirety and had been advised that such denial might have been due to the fact that said district does not use water, but appeared only for water users. It was further recited that the Green Mountain Reservoir was constructed by the United States Bureau of Reclamation under the terms and provisions of said Senate Document No. 80; that, as therein contracted for, 52,000 acre-feet of the water of said reservoir was stored for replacement purposes for the use of petitioners and other water users in Western Colorado and 100,000 acre-feet stored primarily for power purposes, with provision that it be released as required to maintain the flow of the Colorado River to supply irrigation appropriations including waters used by petitioners through the works of the Grand Valley Reclamation project and that petitioners had beneficially used said supplemental waters and will require them in the future.

Petitioners further recited their information that the United States of America, as owner of the physical works of the Green Mountain Reservoir, appeared and filed claim herein and then withdrew from said proceedings and instituted an action in the United States Court for the District of Colorado to establish its rights and those of its consumers; that if said latter court be denied jurisdiction thereof, claimants may have their rights subordinated to rights which are in fact junior to theirs. Wherefore they prayed permission to appear and file their claim in the proceeding and adopt the evidence

submitted by Colorado River Water Conservation District as to the Green Mountain Reservoir and offer additional evidence in support of their petition, both in the adjudication of water for irrigation and in the adjudication of water for purposes other than irrigation.

Thereafter, promptly after announcement of decree by the trial court, Grand Valley Irrigation Company petitioned to reopen the case and adopt and offer evidence, therein reciting its authority to operate certain canal systems and furnish stockholders water for irrigation of more than 30,000 acres of irrigated land and domestic use; the shortage of water of its existing decrees to supply its needs; the necessity for stored water to assure the filling of its senior decrees; the building of Green Mountain Reservoir for the purpose of supplying such needs, and the demand for and prior use of such water by irrigators under claimant's system. Petitioner made further recitals as in the petition of Grand Valley Water Users Association.

In its decree, the court found that the evidence submitted with respect to the claim of the Colorado River Water Conservation District for a decree to the Green Mountain Reservoir was insufficient to justify the court in entering any decree in its favor, and its claim was denied. Motions were filed by Denver and Colorado Springs to deny and dismiss the petition of Grand Valley Water Users Association, Orchard Mesa Irrigation District and the Palisade Irrigation District and petition of Grand Valley Irrigation Company, and after argument the court sustained said motions in both cases.

Colorado River Water Conservation District here asserts error in the denial by the trial court of any priority to the Green Mountain Reservoir and power plant. We think the evidence submitted by said district, as above recited in brief, was sufficient to require a storage decree to the reservoir, if statement of claim therefor was properly before the court.

The Northern Colorado Water Conservancy District,

although it had withdrawn its claim in behalf of said reservoir and power plant, and had no claim therefor remaining before the court, tacitly acknowledges the court's continuing jurisdiction by appearing here on error as a party, with a brief supporting the findings of the trial court, yet at the same time therein asserts that the court lacked jurisdiction to enter any decree as to the water rights of the Green Mountain Reservoir for the reason that said reservoir is the property of the United States and the state court had no jurisdiction to enter judgment against the United States as owner of the project or against those for whom it is trustee of the water rights, and that "officers of the United States were without authority to submit rights of the United States to jurisdiction in these proceedings against its priority of water right."

 Water rights cannot in fact be adjudicated as to part of the claimants only. They are relative both as to time and amount. None is certain unless all are determined. If the contention of Government immunity be true, then all the many water adjudication proceedings in Colorado and elsewhere in which the rights of the United States have been submitted by its officers and have been adjudicated by the court have resulted in decrees void as to the United States and therefore uncertain as to the rights of all other parties. If this contention be true, the landowner who is so fortunate as to have the use of other taxpayers' money through the Reclamation Bureau in building his reservoir or ditch is exempt from our statutory proceedings for adjudication of his water rights, and the arm of the state is paralyzed in this vital function, at least until such time as the officers of the Federal Government see fit in their superior wisdom to bring action in the Federal Court.

Of a certainty, the United States has no claim as owner of the water rights of the Green Mountain Reservoir. The court said, in *California Oregon Power Co. v. Beaver Portland Cement Co.*, 295 U. S. 142:

"As the owner of the public domain, the government possessed the power to dispose of land and water thereon together, or to dispose of them separately. *Howell v. Johnson,* 89 Fed. 556, 558. The fair construction of the provision now under review is that Congress intended to establish the rule that for the future the land should be patented separately; and that all non-navigable waters thereon should be reserved for the use of the public under the laws of the states and territories named: * * * "What we hold is that following the act of 1877, if not before, all non-navigable waters then a part of the public domain became *publici juris,* subject to the plenary control of the designated states, * * *."

 The fact that the Government owned the reservoir gave it no title or claim to the water rights accruing by virtue of storage of water therein; thereby it became only a carrier and trustee for the owners whose priority was to be adjudicated. As said in *Ickes v. Fox,* 300 U. S. 82: "Although the government diverted, stored and distributed the water, the contention of petitioner that thereby ownership of the water or water-rights became vested in the United States is not well founded. Appropriation was made not for the use of the government, but, under the Reclamation Act, for the use of the land owners; and by the terms of the law and of the contract already referred to, the water-rights became the property of the land owners, wholly distinct from the property right of the government in the irrigation works. Compare *Murphy v. Kerr,* 296 Fed. 536, 544, 545. The government was and remained simply a carrier and distributor of the water *(ibid.),* with the right to receive the sums stipulated in the contracts as reimbursement for the cost of construction and annual charges for operation and maintenance of the works." Accordingly, it was held therein that the United States was not an indispensable party to a suit against the Secretary of the Interior for interfering with water rights in operating a reclamation project.

 In the adjudication of water rights within the State of Colorado, adjudication is made, not to the users as such, but to the ditch or reservoir to which the priority is decreed. Where ownership is by corporation, whether it be a mutual ditch or reservoir company, or a separate carrier company, claim is properly made by the company in behalf of the stockholders or other users of the water which it represents. The reasons for this rule are that the number and change of consumers under a ditch might make it impracticable for all of them to be made parties, and the ditch company therefore is obligated to file claim for priority as the trustee for its stockholders and consumers. *Farmers Independent Ditch Co. v. Agricultural Ditch Co.,* 22 Colo. 513, 45 Pac. 444; *Montrose Canal Co. v. Loutsenhizer Ditch Co.,* 23 Colo. 233, 48 Pac. 532; *Randall v. Rocky Ford Ditch Co.,* 29 Colo. 430, 68 Pac. 240.

Under the provisions of the Reclamation Act, it is the duty of the Secretary of the Interior in behalf of the United States to proceed in conformity with state laws.

Section 2 of the Reclamation Act of June 17, 1902, provides: "That nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof * * *."

In *Nebraska v. Wyoming,* 295 U. S. 40, where Wyoming moved to dismiss on the ground that the Secretary of the Interior was an indispensable party, the court said: "The bill alleges, and we know as a matter of law, [citing Act of June 17, 1902, c. 1093, §8, 32 Stat. 390;

U.S.C. Tit. 43, §383] that the Secretary and his agents, acting by authority of the Reclamation Act and supplementary legislation, must obtain permits and priorities for the use of water from the State of Wyoming in the same manner as a private appropriator or an irrigation district formed under the state law."

In the final opinion in *Nebraska v. Wyoming*, 325 U. S. 589, the court said: "We have then a direction by Congress to the Secretary of the Interior to proceed in conformity with state laws in appropriating water for irrigation purposes. We have a compliance with that direction. Pursuant to that procedure individual landowners have become the appropriators of the water rights, the United States being the storer and the carrier."

The interest of the United States in this proceeding being only that of a carrier or trustee in behalf of the owners of the water, title to which is sought to be adjudicated, its immunity as a sovereign government cannot be extended to the water users. As said in *United States v. Beebe*, 127 U. S. 338, 347, and repeated in *United States v. Bell Telephone Co.*, 167 U. S. 224: "We are of the opinion that when the Government is a mere formal complainant in a suit, not for the purpose of asserting any public right or protecting any public interest, title, or property, but merely to form a conduit through which one private person can conduct litigation against another private person, a court of equity will not be restrained from administering the equities existing between the real parties by any exemption of the Government designed for the protection of the rights of the United States alone. The mere use of its name in a suit for the benefit of a private suitor cannot extend its immunity as a sovereign government to said private suitor, whereby he can avoid and escape the scrutiny of a court of equity into the matters pleaded against him by the other party; nor stop the court from examining into and deciding the case according to the principles

governing courts of equity in like cases between private litigants."

However, we think it unnecessary for us to attempt to determine whether the United States as trustee of the owners of ·water rights under a federal reclamation project, situated as those now before us, can *in invitum* be concluded by adjudication in the state court. That situation does not here exist. Under direction of the Attorney General, the United States voluntarily appeared in this adjudication proceeding, and Northern Colorado Water Conservancy District, which under contract with the United States constructed the Green Mountain Reservoir, voluntarily joined therein. Such action was within the authority of the Attorney General, absent statute. "That the United States have a right to bring suit by their attorney in courts of the several states to enforce their contracts and protect their property without special statutory sanction is not open to doubt." *United States v. Jacobs*, 100 F. Supp. 189. Such right does not depend on the statute of July 10, 1952, which seems to waive the immunity of the United States in such proceedings and consent to jurisdiction independent of voluntary appearance by the Attorney General.

Voluntary appearance by the United States in an existing suit, seeking affirmative relief, is equivalent to the bringing of a suit and subjects the United States to the court's jurisdiction. In *United States v. Guaranty Trust Co. of New York*, 76 F. (2d) 747, the judgment creditor of the beneficiary of a spendthrift trust sought to recover in supplementary proceedings from the annual income payable to the beneficiary. The United States holding claim for unpaid income taxes appeared, also asserting claim therefor, and the Surrogate held that its lien was precluded by exemption under the state law. In the subsequent case brought by the United States in the Federal Court, the court held that recitals of the Surrogate's order were sufficient to show appear-

ance on behalf of the government and that the defense of res judicata was good. In *United States v. Thekla,* 266 U. S. 328, where a steamship, chartered to and in possession of the United States, collided with the barque Thekla, the owners of the steamship libelled the Thekla, whose owner filed cross bill and the United States attempted to file a claim against the Thekla, "without submitting itself to the jurisdiction" of the court. The trial court found against the United States and the United States Supreme Court said, through Holmes, J.:

"When the United States comes into Court to assert a claim it so far takes the position of a private suitor as to agree by implication that justice may be done with regard to the subject matter. The absence of legal liability in a case where but for its sovereignty it would be liable does not destroy the justice of the claim against it. When the question concerns what would be paramount claims against a vessel libelled by the United States were the vessel in other hands, the moral right of the claimant is recognized. * * * The libel in such a case is like a bill for an account, which imports an offer to pay the balance if it should turn out against the party bringing the bill. * * * It is said that there is no statute by which the Government accepted this liability. It joined in the suit, and that carried with it the acceptance of whatever liability the courts may decide to be reasonably incident to that act."

Closer in point, in *United States v. American Ditch Ass'n,* 2 F. Supp. 867, the United States intervened in a suit for adjudication of priorities in the Idaho court. In a suit brought in the Federal Court concerning said water rights, the court said:

"That res judicata applies to priorities or order of user of the waters by the United States as well as all other parties to the suits in the state court is clear. To protect its property the United States has all the rights of persons, may sue in the state courts or in its own

tribunals, and of course is concluded by the decree rendered even as persons are. [Citing cases.]

"Its intervention in the suit of the Bryan decree was in essence a suit by it begun, for that in a suit to adjudicate priorities or order of user of water, all are actors, and it is immaterial how ranged in the record.

\* \* \*

"Of its own volition submitting to the jurisdiction of the courts of Idaho, plaintiff is bound by the decree; and, however unsatisfactory the decree may be, it is too late for the United States, as it is for any party, to abandon that forum of its choice, and, in hope of more favorable result, resort to this tribunal."

 The state court having jurisdiction of the proceeding and the United States having voluntarily appeared, we think that court still retains its jurisdiction. Assuming that the Government could have withdrawn therefrom after other parties had made issue by asserting claims, no request or attempt so to do appears. Counsel, after voluntarily having filed a claim in behalf of the United States and having filed sundry motions in the proceeding, merely served notice on the court that it "hereby withdraws from the above entitled case the claims of the United States of America, heretofore filed on behalf of itself, its Bureau of Reclamation and Forestry Service, Department of Agriculture," and announced that counsel was authorized by the attorney of the Northern Colorado Water Conservancy District "to advise the Court that the said District joins in this withdrawal." That notice was not and could not be considered as a request for or notice of withdrawal of the appearance of the parties, but only as the withdrawal of their pleading, leaving the United States and the Northern Colorado Water Conservancy District as still admittedly parties to the proceeding, but without claim filed and in position to file new and substitute statement of claim if they so desired.

In *O'Connor v. Stanley*, 54 F. (2d) 20, plaintiff sought

to establish a claim against an estate and thereafter filed in the County Court a written dismissal and withdrawal of petition and claim, as well as of an answer filed to the petition and claim of another. The court said: "As to the effect of the so-called withdrawal of the plaintiffs from the administration proceedings, it is observed that no order was entered on this instrument, and it does not purport to withdraw the appearance of plaintiffs in said court, and we think it was ineffectual to deprive the court of jurisdiction, either of the subject-matter or of the persons of the plaintiffs, their appearance not having been withdrawn, and the entire proceeding being without judicial approval or sanction, and apparently without notice to the other interested parties."

Whether the United States or the Northern Colorado Water Conservancy District was a necessary party to this adjudication proceeding is not an issue requiring determination. The record is that both voluntarily became and now are parties thereto. As such, it was their duty to take all necessary steps to protect the rights of the consumers of the water. *Randall v. Rocky Ford Ditch Co.*, 29 Colo. 430, 68 Pac. 240. Having failed to do so, and on the contrary having withdrawn the statement of claim filed in their behalf, they were so derelict in their duty to the consumers of water under the reservoir as to render it imperative in furtherance of justice that the consumers be permitted to take the steps which should have been taken by the owner of the reservoir to protect their rights. Where the interests of beneficiaries are not represented or protected by their trustees, the beneficiaries become proper and necessary parties, with the right to appear and present their case. This they did here and properly so, through the Colorado River Water Conservation District; then, when this was denied, promptly again through their local districts and association. Having appeared to the full extent of

their ability, upon default of their trustee they were entitled to be heard.

Accordingly, the decree of the trial court herein is affirmed, except as to its denial of any decree to the Green Mountain Reservoir and power plant wherein its action is reversed and the case is remanded with instructions to the trial court to reopen the case as to the adjudication of said Green Mountain Reservoir and hydroelectric plant rights, with permission to file claim as may be advised in that behalf, and, upon the evidence already introduced, and additional evidence, if any, which may be tendered, to adjudicate said rights.

MR. JUSTICE HOLLAND, MR. JUSTICE MOORE and MR. JUSTICE KNAUSS dissent from the decision as to the amount and date of priority awarded to the City of Denver.

MR. JUSTICE MOORE dissenting.

I agree generally with the views expressed by Mr. Chief Justice Stone in the opinion written by him, except for the disposition which he makes concerning the claim of the City and County of Denver. The case is of sufficient importance to require a statement of my conclusions, reached after careful study, even though they must appear in the form of a dissenting opinion.

Determination of Denver's claims depends upon three main propositions: First: As of what date did Denver initiate its water rights? Second: During what period thereafter did Denver exercise reasonable diligence toward perfection of the initiated water right? Third: What amount of water did Denver appropriate?

Under the contentions made by the parties the following pertinent questions of law are raised: (a) Can a water right relate back to a date prior to the time of the first physical work thereon which would, by its location and appearance, give notice of an intention to appropriate water to those having an interest in the

waters involved? (b) To what extent can a claimant of water change his plan of development without that change amounting to a relinquishment of his claim? (c) May a claimant of water offer evidence to show that the water claimed is part of an interrelated system involving other water rights and, if so, is work on various parts of such interrelated system to be considered in determining the diligence with which each of the components in the water rights in the system is being developed? (d) Can the appropriator of water for direct and immediate use temporarily detain such water for his operational purposes without such detention being classed as "storage," and, if so, to what extent?

I will state my views upon the questions as briefly as possible in the order above mentioned.

First Question.

*Can a water right relate back to a date prior to the time of the first physical work thereon which would, by its location and appearance, give notice of an intention to appropriate water to those having an interest in the waters involved?*

This question should be answered in the affirmative. Physical work on a water appropriation, which would put others on notice that water from a natural water course was being, or about to be, diverted for beneficial use is clearly one method by which all interested may be put on notice of the initiation of a water right. It is not the exclusive method, however. In recent years, and especially with respect to water projects of any considerable magnitude, the more usual method has been by making a filing in the office of the State Engineer.

Of necessity, the first physical activity relating to the creation of a water right is the act of going upon the ground to examine what is to be done. Such physical manifestation, in the case of a small project might be followed up immediately with commencement of construction of diversion works, and the activities, all taken together, be ample evidence of the intent to appropriate

which would put other potential appropriators on inquiry.

As this Court pointed out in *DeHaas v. Benesch,* 116 Colo. 344, 181 P. (2d) 453, such work, when carried to completion by the application of water to beneficial use, results in the creation of a water right dating back to the first work, without the necessity for ever filing any map or statement in the office of the state engineer or the clerk and recorder. In *DeHaas v. Benesch, supra,* there was nothing to indicate that the work of the appropriator was attached to any particular claim of right to water, for the water was commingled with the waters of other appropriations and carried in the same ditch. Yet, we there held that the true test of appropriation was the successful application of the water to beneficial use and *not the appearance of the means of accomplishing that application.*

This Court has held that physical work giving the appearance of a start on the creation of an appropriation did not constitute adequate evidence of such a start where not in good faith. *Fruitland Irrigation Co. v. Kruemling,* 62 Colo. 160, 162 Pac. 161. The converse also is true. Physical work, undertaken in good faith, though not appearing to relate to an appropriation, should be considered as evidence of an appropriation if, with all the other circumstances, it appears that it was actually a part of a good faith effort to make an appropriation.

Reasonable diligence in the creation of a large water diversion and use project demands adequate planning as the first step. Initiation by field survey has had the approval of this court, as the first step from which a water right may properly be dated. *Taussig v. Moffat Tunnel Co.,* 106 Colo. 384, 106 P. (2d) 363. Such a field survey might or might not indicate, by its appearance, the nature or extent of the proposed appropriation. It might not even appear to be a survey for a water right project at all, yet, if made in good faith and followed up with

due diligence, would constitute the first step, and consequently would date the beginning of the project.

Under these circumstances, it is greatly to the advantage of the public that some means be provided for recording the meaning of such surveys. As early as 1881 provision was made for filing a record of the work of such surveys in the office of the state engineer. The early statute even went so far as to destroy the effect of commencement of a water right by survey if the record of the survey had not been made of record with the state engineer within sixty days of commencement of the work. This penalty was dropped in the amendatory Acts of 1903 and 1911 for the obvious reason that if all the work required by law, now appearing as section 29, chapter 90, '35 C.S.A., were to be performed, it would be impossible to have it in the office of the state engineer within sixty days of its commencement in the case of a work of any magnitude. The statute itself recognizes this, and requires a preliminary filing, *but again without penalty for failure to comply.* It follows that work on a water diversion project is not lost to the would-be appropriator because what he does, does not appear on the ground to be work on an appropriation, or because he does not file the record thereof in the office of the state engineer within sixty days. In fact, if the work departs from the appearances it is not lost to the appropriator as part of his effort. I quote as follows from the opinion in *DeHaas v. Benesch, supra:* "Whether or not ditches were constructed in accordance with the filings of maps and statement * * * was * * * not of the substance of the appropriation."

If the statute attaches no penalty to the failure to file a map and statement within a prescribed time, it is not for this court to impose one, especially since, as pointed out in *DeHaas v. Benesch, supra:* "The statute further provides that nothing therein contained shall be construed to the injury of those having rights prior to those of claimants, or so construed as to prevent a proper ad-

judication of rights in accordance with existing laws governing such adjudications."

Second Question.

*To what extent can a claimant of water change his plan of development without that change amounting to a relinquishment of his claim?*

As will be seen from the question in *DeHaas v. Benesch, supra,* there are some changes which can be made in the plan of a water development which will not constitute a relinquishment of the project. One criterion for determination of this problem was used by the United States Supreme ,Court in the case of *Wyoming v. Colorado,* 259 U. S. 419, where the changes planned had to do with the determination of "whether" the would-be appropriator would proceed at all with the diversion project. Such changes are to be distinguished from those which go rather to selection of the most economical or effective means to be employed for the accomplishment of a diversion and use of water, concerning which there already is a fixed and definite intention to take. Once the decision has been made to proceed with the project, continuing investigations and changes are simply evidence of diligence and endeavor to accomplish the greatest good at a minimum of cost to the public, not abandonment of the project.

This Court has adopted a liberal rule in this regard. In the Taussig case, supra, at the time of the adjudication proceedings neither the purpose nor place of use of the water ultimately proposed to be diverted was known. As we there pointed out, before a final decree can be entered these uncertainties must have been eliminated. That is to say, before the right could be completed, the plan of construction existing at the time of the adjudication would have to be modified so as to include the means of making beneficial use of the water involved. Such a situation does not preclude the rendition of a conditional decree or work a relinquishment of the right. In fact, as we pointed out in the Taussig case, a condi-

tional decree may be necessary to furnish that "reasonable assurance" essential to financing a private project. We see no reason why public funds are not entitled to equal assurance.

The question under discussion cannot be answered in terms applicable to all controversies. The facts must govern each individual case. The basis for examining the facts, under the law of Colorado as announced by this Court over the years, may well include the following: (a) The appropriator's acts should evidence a fixed and definite intention to take a fixed amount of water for application to a beneficial use. (b) A change in plan, which indicates a lack of fixed purpose or which shows only a general desire without a fixed determination to fulfill the desire, would not support an appropriation. (c) Changes undertaken with the apparent intent to improve or make more efficient or less costly the whole work to be undertaken, should be regarded as the natural diligence of a prudent man rather than the want of constancy in the prosecution of the undertaking.

Within these three pertinent principles I think it is abundantly clear that, at least from and after the 19th day of October, 1927, the City and County of Denver made no change in its plan to develop the water right claimed, which would amount to a relinquishment of the plan and purpose then fixed upon to appropriate 1600 second feet of water.

Third Question.

*May a claimant of water offer evidence to show that the water claimed is part of an interrelated system involving other water rights, and, if so, is work on various parts of such interrelated system to be considered in determining the diligence with which each of the component water rights in the system is. being developed?*

This question must be answered in the affirmative. With respect to the development of a water right to irrigate a single piece of. land through a single ditch to which water is diverted through one headgate, it would

be obvious that diligence could be shown by reference to work on any, or all, of the three component parts: diversion dam, carrying ditch, or distribution laterals.

As the works become more complex, including several sources of supply, wider spread uses, and a variety of purposes, a project may cross county lines, irrigation district or irrigation division lines, and different jurisdictional lines for adjudicating the water rights involved. It does not appear that there is any point at which a water system becomes so large that its parts no longer relate to each other in such a way that work on one part may not constitute diligence with respect to completion of the whole including its other parts. It may well be that a single entity may have holdings so extensive that many of them are unrelated to others. In such a case, work on one holding would not constitute work on an unrelated holding.

It appears, therefore, that the test of the extent to which work on one part of a water system may properly relate to another for the purpose of determining due diligence, is whether the parts of the work relate to a single integrated purpose intimately enough that progress on one part has a direct bearing upon another part. What we are really considering is whether or not the work done is within the limits of what is reasonably to be considered as customary to an enterprise unified under single management and in which impairment of any part tends to directly impair the remaining parts, or in which construction of one part directly contributes to the whole which is comprised of other parts.

Much of the evidence which was admitted, and that which was erroneously excluded, established the fact that the city of Denver has one interrelated water system which should have been considered as a whole in so far as the question of reasonable diligence of the city in going forward with the Blue River diversion is concerned. Even without the full delineation of fact which might have been presented had the trial court not re-

stricted evidence to the Blue River unit alone, the only evidence in the record concerning Denver's efforts shows a continuing good faith endeavor to accomplish the appropriation for which she now seeks a conditional decree. Arguments of counsel, pro or con, cannot take the place of evidence.

The majority opinion gives lip service only to the proposition that in the matter of diligence of the city in going forward with the Blue River diversion, its activity in the development of other arms of the system should be considered. This appears in the majority opinion in the following language: "Therefore, diligence in the prosecution of the Fraser and Williams Fork projects cannot be imputed to the Blue River projects. However, the fact that the city of Denver was engaged in the construction of these other projects may properly be considered together with other evidence as to existing facilities and ability of the city in determination of the issue of reasonable diligence." By this language the majority opinion brushed off most pertinent and undisputed evidence, as well as facts concerning which this Court has judicial knowledge, concerning the desperate need, in the early years of the 1930 decade, for speedy increases in the water supply of the city, and the heavy demands upon the city for completion of developments of other related works for the diversion of water from streams tributary to the Colorado river. The majority opinion comments that: "There was no evidence of any effort by Denver to finance the project prior to the year 1946, but only of efforts to induce the United States to do so." Unmentioned is the fact, which every citizen then living well knows, that in 1929 the whole nation trembled and lay prostrate in depression; that the public treasuries were empty; that for years thereafter any attempt to finance such a large undertaking upon the local level would have been sheer folly; and that the only hope for resources sufficient to warrant a start at construction was to seek the financial backing of the United

States. In those years all business, both public and private, looked only to Washington for rescue from total collapse.

At about the time when another approach to the financial problem might reasonably have been expected to succeed, World War II broke out and thereafter for several years the productive energies of all the people were concentrated on the war effort. Men and materials were not to be had for any development of this kind, which could possibly wait. Just as soon as the conflict ended and war demands relaxed, construction of the tunnel began, and, despite inadequate financing and disappointments, the city has gone forward with the work. Thus, although the majority opinion declares that, in determining diligence on the part of the city, this Court "may consider" the other substantial emergency activities of the city to meet the demands of its residents for water, "together with all other evidence as to existing facilities and ability of the city" to go forward on the Blue River diversion, it is very apparent that the opinion fails to give any serious thought to those facts and circumstances. To my mind it is clear, as a matter of law, that under the undisputed facts shown by the record and from other pertinent facts judicially known to this Court, that the city has been diligent in its efforts to divert water from the Blue River, and that the majority opinion, to the contrary, is patently erroneous.

From an examination of the whole record it appears that Denver, with respect to its Blue River project has done what might reasonably have been expected of any city similarly situated. In 1939, in *Denver v. Sheriff*, 105 Colo. 193, 96 P. (2d) 836, this Court said, inter alia: "It is not speculation but the highest prudence on the part of the city to obtain appropriations of water that will satisfy the needs resulting from a normal increase in population within a reasonable period of time." With the metropolitan population now at about 600,000 these words of fifteen years ago seem prophetic. In the Sheriff

case we also said: "The furnishing of an adequate supply of water to 350,000 people requires managerial judgment and involves an ever-changing problem." This is no less true today, with the increased population condition, and furnishes an approach to the one serious challenge to the good faith of the city in seeking the water supply involved here.

Fourth Question.

*Can the appropriator of water for direct and immediate use temporarily detain such water for his operational purposes without such detention being classed as "storage," and, if so, to what extent?*

This question brings us to a consideration of a new and somewhat novel legal problem involved in Denver's claim. Stated in another way the question is: Can Denver substitute a mechanical equivalent for the proposed 1600 second feet tunnel?

Under the decisions of this Court it has been established that one who owns the right to divert water for direct and immediate use may not lawfully divert water under such right for the purpose of storing it for use at some indefinite future time. Under our law the owner of a water right does not have the right to divert a given quantity of water continuously, but only when circumstances are such that he can make beneficial application of it to use. When a water right owner does not need water, his right gives him no right to divert; but the water which he might be entitled to if he needed it must be allowed to flow to other appropriators who do need it. Hence the rule against storing on a right originally appropriated for immediate and direct use. The trial court limited Denver's diversion to an amount which can be diverted through a tunnel of the size it is currently drilling, 788 second feet.

Denver's filing map, which is its Exhibit "B," contains as the sixth representation on it: "The method of construction contemplated (for the tunnel) is to first drive a heading of economic dimensions and then to en-

large and line the tunnel to its full size." Denver's testimony is that from an engineering standpoint the enlargement of the tunnel can be accomplished by the substitution of a mechanical equivalent, to wit: a forebay of sufficient size to temporarily impound the difference between the 1600 second feet appropriated and the 788 second feet, which the present tunnel will carry, until lessening of the runoff in the Blue River and its tributaries at Dillon affords less than 788 second feet of flow, after which the forebay would gradually lose its contents. Denver's testimony was that if such a mechanical equivalent is prohibited because of our law against storing water appropriated for direct and immediate use, the idea of a reservoir or forebay would be dropped and the city would enlarge the tunnel as stated in Exhibit "B." The testimony was that a saving of $10,000,000 could be made under the substitute plan. We must therefore examine the circumstances to ascertain whether or not the proposal contemplates a lawful operating detention or an unlawful storage, in view of the principles discussed under the fourth point above.

Under the testimony, Denver's proposed appropriation is for 1600 second feet. There is no evidence whatsoever that the 788 second feet awarded by the trial court is correct. By confining the amount of water decreed to 788 second feet, the trial court simply ignored the evidence that Denver was building the present tunnel as the first step toward a 1600 second foot diversion, and that there were two alternate methods of increasing the capacity from 788 second feet to 1600 second feet, one of which was the use of Dillon reservoir as a forebay, and the other was a physical enlargement of the 788 second feet tunnel.

It is my conviction that the plan of the City and County of Denver for the accumulation of water in the Dillon reservoir during the season of peak flows, with subsequent withdrawal at a rate permissible by the tunnel capacity, does not violate the rule against the storage

of direct flow of water. This Court has held on numerous occasions that the impoundment of ditch water diverted into a canal upon the ditch's decree for direct irrigation cannot be made the basis for obtaining an independent and separate storage right. *Greeley & Loveland Irrigation Co. v. Huppe*, 60 Colo. 535, 155 Pac. 386.

The cases denying the right to store direct flow water all involve irrigation uses. They are cases in which the owner of a decreed right for direct irrigation seeks later to utilize the ditch, through which such water is conveyed, as a feeder to a reservoir and to obtain for the reservoir a right of the same priority date as that for the ditch. *New Loveland & Greeley Irrigation & Land Co. v. Consolidated Home Supply Ditch & Reservoir Co.*, 27 Colo. 525, 62 Pac. 366; *Windsor Reservoir & Canal Co. v. Lake Supply Ditch Co.*, 44 Colo. 214, 98 Pac. 729; *Finley v. Cache La Poudre Irrigation Co.*, 44 Colo. 234, 98 Pac. 173; *Greeley & Loveland Irrigation Co. v. Huppe*, 60 Colo. 535, 155 Pac. 386, or cases involving injunction suits to restrain storage of water decreed for direct irrigation as against other rights. *Greeley Co. v. Farmers Pawnee Co.*, 58 Colo. 462, 146 Pac. 247; *Handy Ditch Co. v. Greeley & Loveland Irrigation Co.*, 86 Colo. 197, 280 Pac. 481. *Holbrook Irrigation District v. Fort Lyon Canal Co.*, 84 Colo. 174, 269 Pac. 574, is not in point because there, by the consent of the parties, a direct irrigation right was not decreed to a feeder canal. (See opinion on Rehearing, 84 Colo. 197.)

None of the cases mentioned above involves municipal uses under a gigantic project such as that proposed by Denver. In the case at bar Denver seeks to divert 1600 c.f.s. from the Blue River and its tributaries and transport that water through the Continental Divide by means of a tunnel which has a capacity of 788 c.f.s. Water diverted through the collection system will be accumulated in the Dillon reservoir and allowed to flow from it at a rate permissible under the tunnel capacity. The reason for this method of operation is that the cost of a

tunnel to carry 1600 c.f.s. is some $10,000,000 in excess of the cost of the Dillon Reservoir and of the smaller tunnel.

This is not a case in which water covered by a direct irrigation right is sought to be stored for future use with the priority date for such relating back to the decreed priority date of the direct irrigation right. Rather this is a case in which, in an adjudication suit, the city seeks a conditional decree permitting the diversion and use of a defined quantity of water for municipal purposes. The impoundment of this water in the proposed Dillon reservoir will not adversely affect any other water users because there is and will be no increase in the quantity of water, measured by volume and time, which the city would be entitled to divert annually if it had a tunnel with the capacity of 1600 c.f.s. *(Seven Lakes Reservoir Co. v. New Loveland & Greeley I. & L. Co., 40 Colo. 382, 93 Pac. 485).* As there will be no increase in the total annual quantity of water taken over that which might be taken by a tunnel with 1600 c.f.s. capacity, there is no reason why Denver should be required to expend an additional $10,000,000.00 in order to satisfy a rule of law heretofore applied in cases involving irrigation of lands in which the facts were altogether dissimilar from those present in the case at bar. This Court will not close its eyes to practical considerations.

Unquestionably the City of Denver would have the right to appropriate the 1600 cubic feet per second of water by the construction of a tunnel of that capacity. This objective could be attained with no ground for opposition by the expenditure of an additional $10,000,-000.00 of the people's money. If the same result can be obtained by the substitution of a mechanical operational equivalent to the larger tunnel I am at a loss to understand why the increased burden upon the taxpayers should be required. In the last analysis the result would be the same and the rights of other appropriators would in no wise be jeopardized.

It is no answer to the above to assert that Denver applied for and was awarded a storage decree for impounding water at the Dillon reservoir, and that, "One cannot add water to a full cup, and may not have a second decree for water from the same source to be held at the same time in the same reservoir to which a decree already has been awarded to its full capacity." This statement quoted from the majority opinion is plausible enough but it fails substantially to present the whole picture. One most certainly can have a full cup of water which is subject to the application of two rules of law governing the use to which the water in the cup may be put. If the direct flow decree permits withdrawal of the water from the cup under a priority date of 1927 one result is obtained which would be entirely different from securing a full cup of water under a storage decree with a priority date many years subsequent to 1927. Thus the illustration of the "full cup" fails to hold water.

The majority opinion treats the Dillon reservoir as a storage unit capable of filling under its very late decree. Actually the unquestioned fact is that this reservoir as a storage unit is so junior to other users that it could be expected to impound water on its storage decree only on the rarest of occasions. In all normal operations the Dillon dam would serve two functions: One as a headworks for diverting Denver's direct appropriation through the tunnel; and two, for catching an occasional flood in the late summer. There is nothing in our law to the effect that a dam may not be used both as a headgate and as a storage control. In fact the same structure often is used for both storage and direct uses in the case of ditches. Many ditches carry storage water to off-stream reservoirs and also to supply direct appropriations. The same ditch and headgate frequently have both storage and direct decrees attached to them. The identical structure carries both kinds of water. A ditch of a capacity of 500 second feet may one day carry 500 second feet to a reservoir on a storage decree and the

next day carry 500 second feet on an entirely different decree for direct uses. There is no reason why the Dillon dam cannot fulfill in succession both the diverting and the storage functions. If any quantity of water amounting even to a fraction of that awarded the Dillon dam under its storage decree could actually be relied upon under the late priority of that decree, there would be no controversy for determination before this Court.

In conclusion Mr. Justice Holland has authorized me to announce his full concurrence in this opinion and to further say that he would have included the municipality of Colorado Springs in this dissent, and in addition thereto to add the following observation, which is, in his language, as follows:

"In the last analysis the pivotal question involved in determining the conflicting claims that have arisen in this litigation is 'diligence.' In other words, priority rights stand or fall upon a determination of the question of reasonable diligence in connection with the perfecting of different claims. In this regard, I have an indelible impression that there should be a different and more liberal approach to the question of diligence when applied to municipalities in their efforts to carry out their governmental duty and function of obtaining and supplying water for their inhabitants. Our statutes and the decisions of our Courts have been geared largely to the matter of appropriation of water for irrigation purposes, and by virtue of such statutes and decisions, there has been, and now appears in the majority opinion, an infringement upon the truly domestic use of water. It is advantageous and profitable to a farmer to have water for the development and maturity of his crops; however, it is fundamentally more important that people congregated in a municipality have water to sustain life itself, as well as health and safety. A municipality cannot prevent thousands of people taking up their abode in a city, and the domestic need is at once presented. To meet this all important matter of providing water for

domestic consumption, vast plans must necessarily be conceived, studied and tested, and finally, financed to accomplish the required result. This is not a matter of overnight arrangement, so to speak, but necessitates far more consumption of time and, in many instances, change of original plans than is required to arrange for the taking of water from a stream or streams to be employed on lands for agricultural purposes. On the part of a municipality it may by necessity become a large integral system, the perfection of which demands changes for feasible, physical reasons, as well as economic considerations. Such would be entirely different from the more simple matter of declaring an intention to appropriate water for field use and following that intention in a reasonable time with some physical demonstration of carrying the intention forward. What might rightfully be determined reasonable diligence in the liberal sense application on the part of a municipality with such plan, could properly be considered negligence on the part of appropriators for other purposes. It is my firm conviction that our statutes and decisions should be retimed to meet the actual necessities of life that are inescapable in a city in its attempt to care for a mass of humanity. We find water regulations imposed upon city dwellers when no rigid restrictions are imposed upon the takers of water for other purposes under their decreed rights. I ally myself on the side of the individual and his vital needs for life itself as against industrial plants, mountains of trees and fields of grain. The individual would have little need for the latter if he could not have a drink of water. We are taken back to the firmly established proposition that first things come first. By the strict application of our present water statutes and the adherence to decisions that have not taken or allowed any more liberal approach to the question of diligence in these appropriation matters as they relate to a municipality, do we further hasten the day when the growth of cities is halted, and by such a standstill, allowed to

wither on the vine, while water may freely be taken under old priorities, allowed to run across the land, and finally back to the sea, while the city dweller's tongue may parch with thirst."

For the foregoing reasons I am of the opinion that the City and County of Denver is entitled to a conditional decree for 1600 cubic feet per second, with a priority date as of October 19, 1927.

Mr. Justice Holland and Mr. Justice Knauss concur in this dissent.

On Supplemental Motions and Petition for Rehearing.

Statement of Mr. Justice Holland.

The position of Mr. Justice Moore, Mr. Justice Knauss and myself, taken at the time of the announcement of the majority opinion herein, and to which we still adhere, admits of no uncertainty; however, in the fulfillment of the processes of our Court there comes a time when the minority, as is expected of the parties litigant and the public, must accept and adhere to the finality of the majority opinion. Therefore with this correct procedure in mind, I had no hesitancy, after the regularly allowed motion for rehearing was denied on December 13, 1954, and the remittitur issued, to make the adopted motion that supplemental motions for rehearing and motions for further relief and to recall the remittitur be denied, which were denied on January 3, 1955, and January 13, 1955, respectively. These motions and petitions were unanimously denied. Without the slightest participation as to the merits of the original case or the opinion therein, Mr. Justice Lindsley unhesitatingly participated in the matter of the denial of the last of the subsequent motions as proper procedure to establish finality as is proper in this, as well as other litigated cases.